I must respectfully disagree with the opinion of the majority. Because police officers had the right, by warrant, to search the premises not only for a gun, but for any of its component parts and also for other fruits or instrumentalities of the crimes involved, I would hold that the search here was absolutely within law and affirm the trial court as to its decision not to suppress the evidence in question.
The majority concedes that officers possessed the right to continue searching the apartment building even after a non-specific gun was found in Clinton Longmire's possession at the time of arrest. As to the specific containers searched, however, the majority concludes that a video cassette box and a wrapped package holding $1,500.00 in food stamps found within a heavy plastic shopping bag containing a substance which looked like marijuana and held $17,000.00 in cash should not have been searched. The majority opines that the video box was too small and light and the package of food stamps too small to hold a 9mm gun, and were therefore outside the scope of the search warrant. The majority then argues that the items found within the video cassette box and the wrapped package cannot fall within the plain view exception to the warrant requirement because the officers had no justification for looking into either container. I would hold that the officers were fully justified in this search and that a discussion of the plain view doctrine is unnecessary.
I must disagree with the majority's analysis for three reasons. First, the majority takes exception to Davis v. State (June 18, 1997), Arkansas Ct. App. No. CACR96-1337, unreported, where a .38 caliber pistol was found in just such a video cassette box. Although the officer who opened the video box in the matter before us testified that he knew that it did not have a pistol in it, the subjective attitudes and mental impressions of the officers executing the search warrant are not part of our review of the constitutionality of the search. Horton v. California (1990),496 U.S. 128, 138. If the video box could have objectively and reasonably held a 9mm pistol or its component parts, then the video box was a viable area to search even using the majority's reasoning, as can be seen from the next, second, reason I disagree with the majority.
The majority contends, essentially, that because a warrant may be so specific as to state that a search be undertaken not only for a gun as a whole but for any component parts, that warrant must so state. The majority also believes that the "fruits or instrumentalities" language inserted into the warrant is superfluous, as these were never described with more specificity. Using the cases the majority relies on, it is difficult to determine how this conclusion was reached, since none of these supports the majority's conclusion and, in fact, as easily supports the opposite conclusion advanced by this dissent.
The majority begins by relying on State v. Benner (1988),40 Ohio St.3d 301. I would agree that Benner is relevant. I would disagree as to Benner's impact, however, as its factual dissimilarity does not lend itself to any meaningful application to the matter before us. In Benner, officers were authorized to look for fibers, hairs and other trace elements of the crimes of rape and murder. Defendant argued that officers should have been told specifically which hairs, fibers and other "trace elements" they must look for. The court overruled this argument, stating that, "[i]n search and seizure cases where a warrant is involved, the requisite specificity necessary therein usually varies with the nature of the items to be seized." Id. at 307. As officers could not possibly know which items or locations in the defendant's homes or truck would yield these elements until they began their search, the warrant was not impermissibly broad. Further, the language regarding "other trace evidence," which the Supreme Court agreed was unarguably very broad, gave the officers enough of a general parameter guideline that this "catchall phrase" also did not serve to invalidate the warrant or the search. Id. at 307.
Since Benner provides only vague, general guidelines, and refers us to a fact-specific review, we must look to similar cases for guidance. InState v. Jordan (Apr. 29, 1999), Cuyahoga App. No. 73453, relied on by the majority, the issue appears to be whether a search warrant which allows a search for bullets as well as a gun as a whole is impermissibly broad. Unquestionably, if the warrant allows a search for bullets, there are very few areas of a residence which will not be susceptible to search. The court in Jordan stated that the warrant is not overbroad, even though allowing for an extensive search, because the warrant was sufficient to prohibit a general, exploratory search. Thus, Jordan holds that a more specific warrant is valid, but does not in any way require
such specificity. The Jordan court also upheld language in the warrant as to a search for any other evidence of specific crimes, finding the language authorizing a search for handguns, ammunition, and any or all other evidence pertaining to the charged crimes was sufficiently specific. It would appear, then, that Jordan allows for and upholds the "fruits and instrumentalities" language such as we find before us.
In State v. Van Johnson (Feb. 1, 1990), Montgomery App. No. 11347, the warrant in question likewise authorized a search for both "ammunition" and "parts of weapons". Apparently, the search authorized police to look for very small gun parts, used to convert conventional weapons to automatic. Certain of these parts could be as tiny as one-eighth of an inch. Police looked into an opaque aspirin-type bottle and found illegal drugs. The issue was never addressed by the court, however, since the count against the defendant which involved the illegal drugs was dropped. Even though it appears that the court was ready to uphold the search, it eventually determined that the issue did not need to be decided. Thus, a very analogous issue was not ultimately addressed in VanJohnson, and this case stands only for the proposition that a warrantcan be more specific, not that it must be more specific.
State v. Williams (1978), 55 Ohio St.2d 82 also fails to shed light on the instant matter, contrary to the majority's assertion. In Williams,
police had a warrant allowing them to look in a garage for a stolen hydraulic jack, cutting torch and acetylene tank. Police removed other auto parts from the garage. The matter dealt not with the scope of the warrant, but whether under the plain view doctrine the police could confiscate other auto parts, parts which the officers could not and did not immediately or obviously connect with any crime. Auto parts are likely to be found in a garage. Thus, unless the officers knew the seized parts, not named in the warrant, were criminal instrumentalities or fruits of a crime, they could not be seized under the plain view doctrine. Again, we are currently dealing with items seized pursuant to a search warrant, not under plain view. Williams is also inapplicable to the matter before us under the Benner rationale, which requires a factual, case by case analysis.
State v. Fields (1971), 29 Ohio App.2d 154, raised by the majority, actually seems to support the validity of the search undertaken in the case at bar. The majority's conclusion that the shell casing found could be validly seized because it was, "discovered in a place or container in which [the gun] itself could be found," is a material misstatement of the holding in Fields. The matter before the Fields court was, where the warrant authorized police to look for a .38 caliber revolver, a ladies' purse and its contents and the police found, instead, a .38 caliber shell or casing in a dresser drawer, the casing could be seized and admitted. The argument of the defendant was that it could not, because it was not specifically named within the warrant as an item to be located and seized. While the casing was undoubtedly discovered in an area police could have searched for the entire gun, the court held that seizure of the casing was valid for two reasons. First, the casing was closely related to the crime. Importantly, the court also stated at page 161:
 "The .38 calibre casing was discovered in the area properly being searched within the purpose for which the search warrant had been issued. The .38 calibre shell casing may be considered as being relevant to, if not a component part of, the instrumentality of the crime, as well as the crime itself. As a firearm, a revolver is of little use without ammunition, which is composed of the bullet, the shell, and the necessary powder or charge. The latter elements, coupled with the former, constitute the complete instrumentality
possessing the capabilities of facilitating the commission of a crime." (Emphasis added).
 Fields approved the seizure, then, because the warrant authorizing a search for a gun also authorized a search for any component of the gun.
Returning to the matter before us, I do not believe that a search warrant for a 9mm auto-pistol must be so narrowly interpreted as to exclude the possibility of also searching for the ammunition magazine and/or bullets in places where a magazine or ammunition could be found. The magazine is an integral part of the gun, but is also easily removed and reattached. Needless to say, bullets are also easily removed. Thus, any search for a gun which uses such a magazine may reasonably entail a distinct search for the magazine and/or a search for separate ammunition used or intended to be used in the specified crime or crimes. Also, since a modern gun, especially, can be broken down into component parts and each part separately hidden, any one of those parts could have been located in either the box or the plastic package. While subjective thoughts of the searching officer should not be considered, this is precisely what Officer Wilson testified as regards the video box, as the majority correctly points out.
Third, in addition to the gun, the search warrant authorized a search for, "other instruments [or] fruits of these crimes * * *." Although the majority would have us disregard this language as meaningless, as earlier discussed, citing a few cases where the ammunition and component partswere specifically listed in a warrant, the United States Supreme Court has interpreted almost identical language to authorize the search and seizure of other evidence relating to the specific crimes listed in the search warrant. Andresen v. Maryland (1976), 427 U.S. 463, 480. See also the discussion of State v. Jordan, supra. The crimes listed in the search warrant in the instant case were murder, attempted murder and robbery. At a minimum, the additional language in the warrant also allowed the officers to search for the bullets used or intended to be used in those crimes or bullets fired from the same gun used to commit the crimes. Bullets could easily have been located in the video box and/or in the wrapped food stamp package at issue. The fact that the scope of the search legitimately includes very small objects does not transform it into an unconstitutional generalized search, see State v. Jordan, supra, also State v. Benner, supra. One can also assume with a robbery charge that money might easily be a fruit of the crime. No one disputes that the shopping bag contained large amounts of money in plain view, as well as the plant materials which actually turned out not to be marijuana. Upon this discovery, it was reasonable to believe that the wrapped package could contain, if not the entire gun, parts of this gun, bullets or an entire magazine. There is no showing that this bundle was too light to contain any of these, only that, while the shopping bag itself was heavy the officer did not think the wrapped package held a whole gun.
Thus, I would find the search here to be valid and would affirm the trial court's decision not to suppress the evidence found during this valid search. The majority seeks to set certain boundaries on the police in a bright-line fashion; i.e. in order to look for component parts of a gun and/or ammunition these must be specifically part of the warrant. This is not the law with regard to search warrants. Each situation is fact based, and areas to be searched will be limited only by the facts of a specific case as they relate to the items to be found and the crimes to which these items relate. Further, no court invalidates the "fruits or instrumentalities" language or requires that these also be specified exactly in a warrant to validate a search. Again, this language is limited by the items to be found and the crimes involved. Under the facts of this case and based on the crimes involved, I would hold that the search into the video box and package of food stamps was valid.
While I agree with the majority that, in certain instances, an entire transcript need not be provided in order to review an issue solely relating to the failure to suppress, because Appellants here raised other, additional issues on appeal, the transcripts of trial were absolutely necessary.
As the majority correctly points out, errors in the suppression of evidence are subject to the harmless error rule. State v. Tucker (1998),81 Ohio St.3d 431, 442; State v. Reynolds (1998), 80 Ohio St.3d 670,675. An error is not harmless when there is a reasonable possibility that the evidence complained of might have contributed to the conviction.Champman v. California (1967), 386 U.S. 18, 23; State v. Madrigal
(2000), 87 Ohio St.3d 378, 388. If the remaining evidence presented at trial overwhelmingly supports the conviction, then the evidentiary error is considered harmless. State v. Davie (1997), 80 Ohio St.3d 311, 318.
Often a criminal defendant will enter a "no contest" plea after losing the suppression motion and there will be no subsequent trial transcript to review. If the matter proceeds to trial, a reviewing court must first determine whether the evidence in dispute was even presented and admitted at trial, and then whether any additional evidence admitted at trial provided overwhelming proof of the defendant's guilt. It is nearly impossible for a reviewing court to make these determinations without a transcript of the trial proceedings. Without a transcript, we would be obliged to presume the correctness of the proceedings below, including the presumption that the state provided other overwhelming proof of the defendant's guilt. State v. Grant (1993), 67 Ohio St.3d 465, 483; Statev. Dalton (June 23, 1999), Belmont App. No 97BA56, unreported.
In the matter before us, the record appears to reveal that Appellee had no additional evidence to use at trial other than the evidence presented at the suppression hearing. Therefore, in this particular case, it was unnecessary for Appellants to provide a trial transcript. Appellate counsel should not assume, however, that a trial transcript will never be required on appeal of the denial of a motion to suppress.
In fact, as I would overrule Appellants' assignment of error on the suppression issue, this matter presents an illustration as to why the trial transcripts should be provided on appeal. Appellants' failure to provide transcripts are fatal to their next three assignments of error.
In the second assignment of error, Appellants argue that the court erred in the denial of a motion in limine attempting to exclude evidence of prior bad acts under Evid.R. 404(B). "[T]he denial of a motion in limine does not preserve a claimed error for review in the absence of a contemporaneous objection at trial." State v. Hill (1996),75 Ohio St.3d 195, 203. Here, Appellants' failure to provide a transcript is crucial. Because Appellant failed to provide a trial transcript, they have waived review of this alleged error.
The lack of a transcript is also fatal to the third assignment of error in which they argue that there was insufficient evidence to charge Appellant Shauna Scott with perjury. In order to determine whether or not there was sufficient evidence presented at trial, we must necessarily review that evidence. Without a transcript this review is impossible. Appellants also argue that the date of the alleged perjury was incorrectly stated on the indictment. Absent a showing of prejudice, the exact time and date of an offense are not essential parts of the indictment. Statev. Hart (1994), 94 Ohio App.3d 665, 676; State v. Sellards (1985),17 Ohio St.3d 169, 172; State v. Gingell (1982), 7 Ohio App.3d 364. Furthermore, Appellee clarified the exact date and circumstances of the perjury charge in its June 22, 1999, response to Appellants' motion for bill of particulars.
Appellants' fourth assignment of error argues that there was plain error in the jury charge pertaining to the illegal use of food stamps. Appellants argue that R.C.§ 2913.46 makes it a crime to knowingly possess food stamp coupons in a manner, "not authorized by the `Food Stamp Act of 1977,' 91 Stat. 958, 7 U.S.C.A. 2011, as amended * * *.". R.C. § 2913.46(B). Appellants argue that the jury was not instructed about what the Food Stamp Act of 1977 actually says. They claim that this lack of instruction was plain error requiring a reversal of the verdict.
Appellants' failure to provide evidence that they formally objected to the jury instructions waives all but plain error on review. State v. Bey
(1999), 85 Ohio St.3d 487, 497. Plain error is only found where, "but for the error, the outcome of the trial clearly would have been otherwise."State v. Long (1978), 53 Ohio St.2d 91, paragraph two of syllabus.
At first glance, it does appear that the instruction may be inadequate. The trial court merely instructed the jury that the food stamp program, "was authorized which permits low income households to obtain a more nutritious diet by increasing food purchasing power for all eligible households who apply for participation." (10/4/99 Tr. of Jury Charge, p. 11). The trial court was not required to instruct the jury on the particulars of the entire Food Stamp Act, but it should have paraphrased and summarized the sections which Appellants were accused of violating. Nevertheless, Appellants have not provided us with any arguments indicating that the outcome of the trial would have been different had more thorough instructions been given, we have no transcript of the trial on which to have to base such a determination, ourselves.
Finally, I do agree with the majority on the fifth assignment of error and would also hold that, even with the record as it is presented, it can be seen that Appellants' speedy trial rights were not violated.
For all the foregoing, I would overrule Appellants' assignments of error and I would affirm the trial court in full.